CASANUEVA, Judge,
Dissenting.
Although I recognize that the decisional law has not prescribed talismanic warning language, I also conclude that the warning given to M.A.B. did not comply with the dictates of Miranda v. Arizona, 384 U.S. *1240 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. Therefore, I must respectfully dissent. Critical, in my view, is Miranda’s mandate that a suspect be told that he or she has the right to the presence of an attorney. This is the overarching right from which the right to talk to or consult with an attorney flows. Advising a suspect that he or she has the right “to talk to a lawyer before answering ... any of our questions” constitutes a narrower, less functional warning than that required by Miranda.
The Fifth Amendment to the United States Constitution specifies that no person “shall be compelled in any criminal case to be a witness against himself.” To insure compliance with the protections of the Self-Incrimination Clause when a suspect has been deprived of freedom during a custodial interrogation, the Court identified four essential warnings in Miranda: A suspect “must be warned prior to any custodial questioning [ (1) ] that he has the right to remain silent, [ (2) ] that anything he says can be used against him in a court of law, [ (3) ] that he has the right to the presence of an attorney, and [ (4) ] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.” 384 U.S. at 479, 86 S.Ct. 1602.
Clearly, suspects must be specifically informed that they possess these constitutional rights before law enforcement officers undertake any questioning to solicit incriminating statements that will later be used against them in court. This case focuses on the third right — the right to presence of an attorney — which “must be afforded to [suspects] throughout the investigation.” Id. (emphasis supplied). Here, M.A.B. was not unequivocally informed that he had the right to the presence of an attorney at any and all times during questioning.
My position is derived not only from Miranda but also from the Court’s observations concerning that case in Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Chief Justice Rehnquist, in his analysis of the underpinnings of the Miranda rule and the evolution of the law governing voluntariness and admissibility of a suspect’s confession, reiterated the constitutional bases for the voluntariness requirement. Those rights were historically premised on both the Self-Incrimination Clause and the Due Process Clause of the Fourteenth Amendment, but Miranda changed the focus of the Fifth Amendment inquiry. Dickerson, 530 U.S. at 433-34, 120 S.Ct. 2326. No longer was physical brutality or the “third degree” the major evil to be stemmed; by the time the Court wrote Miranda in 1966, law enforcement departments, seizing advantage from the fact that “custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals,” id. at 435, 120 S.Ct. 2326 (quoting Miranda, 384 U.S. at 455, 86 S.Ct. 1602), had developed psychologically coercive practices to extract statements from suspects in custody. The Dickerson Court therefore again emphasized that the “coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk” that a suspect’s Fifth Amendment privilege against self-incrimination will be obliterated. 530 U.S. at 435, 120 S.Ct. 2326.
Because the rule announced in Miranda is inextricably bound to a suspect’s Fifth Amendment privilege, the warnings have taken on constitutional dimensions. In order to guard against the unacceptable risk of violation of a suspect’s privilege against self-incrimination, “the Miranda rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for *1241 purposes of the prosecution’s case in chief.” United States v. Patane, 542 U.S. 630, 639, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion of Thomas, J., joined by Rehnquist, C.J., and Scalia, J.). Thus, voluntariness of the statements is an inappropriate consideration for resolution of a Miranda challenge; and a concomitant disadvantage of the Miranda rule is that “statements which may be by no means involuntary, made by a defendant who is aware of his ‘rights,’ may nonetheless be excluded and a guilty defendant go free as a result.” Dickerson, 530 U.S. at 444, 120 S.Ct. 2326.
In order to dispel the compulsion and coercion inherent in custodial surroundings, the Miranda rule requires the disclosure of important safeguards, including “the presence of counsel ... [to] insure that statements made in the government-established atmosphere are not the product of compulsion.” Miranda, 384 U.S. at 466, 86 S.Ct. 1602. The Court’s emphasis on the need for counsel’s presence could not have been stronger:
The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our .aim is to assure that the individual’s right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights.... Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.
Id. at 469-70, 86 S.Ct. 1602 (citations omitted; emphasis added).
In my view, the warning that M.A.B. received was constitutionally flawed because the right to talk to or consult with an attorney is not identical to the right to the presence of an attorney. Miranda requires that suspects be “clearly informed” of their right to have a lawyer with them during questioning. Id. at 471, 86 S.Ct. 1602. “[T]his warning is an absolute prerequisite to interrogation.” Id. The safe harbor language — that M.A.B. was informed of his “right to use any of these rights at any time ... during this interview” — simply cannot cure the deficiency because MA.B. was never informed that he had the right to have a lawyer with him at all times during his custodial interrogation. Therefore, it was fruitless to tell him that he could exercise the right at any time when he was never informed of the right in the first instance.
The hallmark of Miranda is the need for effective communication to a suspect of the basic constitutional right against self-incrimination. The right to talk to a lawyer before answering questions, which M.A.B. was told was his privilege, is derivative of his and every suspect’s greater right to have an attorney present at all times during custodial interrogation. That right was never unequivocably conveyed to M.A.B. Thus, the language used by the police department in this case does not rise to a functional equivalent of the required Miranda warning.
Over a century ago, Oliver Wendell Holmes wrote:
The life of the law has not been logic: it has been experience. The felt necessi *1242 ties of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed.
The Common Law 5 (Mark DeWolfe Howe ed., Little, Brown & Co.1963) (1881). Miranda arose from law enforcement practices existing both before and at the time of the opinion, which the Supreme Court concluded necessitated a protective constitutional rule. Miranda exists so that those experiences are not repeated; and, if repeated, a penalty is extracted. The necessity for this rule has been woven into our constitutional fabric.
Because I conclude that allowing M.A.B.’s statements to be used against him violates his constitutional rights, I would hold that the court should have ordered that his statements be suppressed.